In re MISSION OF CARE, INC.

Bankruptcy No. 89–241.

United States Bankruptcy Court, D. Delaware.

March 9, 1994.

Charlene D. Davis, Wilmington, DE.

Michael B. Joseph, Wilmington, DE.

HELEN S. BALICK, Chief Judge.

This is the court's findings of fact and conclusions of law on the objection of the Trustee of Mission of Care, Inc. to the amended proof of claim (No. 9) of Christian Delivery Service, Inc. for $35,982.96. An evidentiary hearing was held on April 22, 1991. In its subsequent briefing, CDS amended its claim to $32,048.36. This is a core proceeding. 28 U.S.C. § 157(b)(2)(B).

I. *Background*

Mission of Care, Inc. is a not-for-profit corporation incorporated in Delaware. From 1979 until 1989, William Keichline, Sr. was the President of MOC. In the spring of 1986, he entered into a business arrangement on behalf of MOC with Gary Vincent of Sears Roebuck & Company at Prices Corner, Newport, Delaware—MOC, using its own vehicles, agreed to transport discounted appliances from a Sears location to the residences of the customers who had purchased the appliances. In 1987, this arrangement was expanded. MOC agreed to pick up old appliances from the residences of Sears customers and bring them to MOC's warehouse. Sears paid MOC for both the delivery and the pick up services.

In 1987, David Cushworth began performing accounting work for MOC. He suggested to Keichline that the delivery service be separated from the remainder of MOC because he believed the service was not within the not-for-profit charter of MOC. Consequently, in the beginning of 1988, Keichline created an entity entitled "Christian Delivery Service."

It is not necessary to characterize the legal form of CDS during its first year of its existence. As fully explained in section II.C., it is irrelevant.

What is relevant is that Keichline took care of the collecting, disbursing, and managing of CDS funds. In January 1988, he opened an account at Bank of Delaware for CDS. Subsequently, Sears' checks for delivery services were made payable to "Christian Delivery Services," while checks for pick up services were made payable, as before, to "Mission of Care."

His son, John Keichline, agreed to supervise and perform the daily delivery services of CDS. However, for most of 1988, CDS had no vehicle of its own. Consequently, John and the other CDS employees used MOC's vehicles. In approximately September 1988, CDS obtained a truck for its everyday use through a lease agreement with Ryder Truck Rental, Inc. Thereafter, CDS continued to occasionally use MOC vehicles for delivery services. Docket 39 ("Transcript") at 19, 147.

CDS also used the MOC warehouse. CDS would load up a truck at Sears with appliances, and drive to the warehouse. There, CDS would unload and store several appliances for future delivery, either that day or the next day. *See generally* Transcript at 88–89. CDS grossed approximately $120,000 in income in 1988.

CDS incorporated on January 18, 1989 and issued one hundred shares of common stock. William Keichline received 26 shares, his wife Marie received 25 shares, John received 25 shares, and his wife Lisa received 24 shares.

On February 1, 1989, Cushworth became executive director of MOC (he continued to perform MOC's accounting). MOC filed a Chapter 7 petition on April 28, 1989, and a Trustee was appointed May 25, 1989. Cushworth prepared the Chapter 7 schedules and statements.

Underlying CDS' claim are 56 checks drawn on the CDS Bank of Delaware account from January 26, 1988 through March 17, 1989 and totaling $35,182.96. Of this total, CDS asserts $32,048.36 benefited MOC. Appendix A of CDS' opening brief itemizes the 56 checks for which CDS seeks whole or partial reimbursement through its amended proof of claim. A copy of Appendix A is attached to this Opinion.[1]

---

**1.** The itemization in this appendix contains many self-serving assertions about the purposes of various check payments. The court rejects these

## II. *Discussion*

### A. *The Burden of Proof*

██ Generally, a proof of claim which alleges sufficient facts creates a *prima facie* valid claim. The burden of going forward then shifts to the Trustee to produce sufficient evidence to negate this *prima facie* validity of the claim. In this case, the Trustee produced sufficient evidence at the hearing to refute the presumption of validity. Since this presumption has been overcome, the burden now shifts back to CDS to establish by a preponderance of the evidence that the claim is valid. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir.1992).

The Trustee concedes that 11 of the 56 payments should be allowed. These 11 checks are listed in the appendix to the Trustee's answering brief. Docket No. 44. Check number 584 is for $111.60, not $11.60 as indicated in the appendix. As to another of the checks in the Trustee's appendix, number 543, the Trustee only concedes $2,168.65 of the $3,168.65 check amount.[2] Thus the conceded total is $5,904.70, and the court will not interfere with this conceded amount. The remainder of this Opinion addresses the other 45 payments and the corresponding objected-to amount of $26,143.66.

### B. *Many of the claimed payments did not benefit MOC.*

██ CDS recognizes that it must prove entitlement to its claim under Delaware law. There was no agreement between CDS and MOC regarding the 45 check payments CDS seeks to recover. Therefore, CDS relies upon the doctrine of money had and received, which requires that:

1. each payment benefited MOC, and
2. it would be inequitable not to reimburse CDS for these benefits.

*E.g., E.F. Drew & Co. v. Southern Grocery Stores,* Del.Super., 183 A. 511, 512 (1935). *Accord Russell–Stanley Corp. v. Plant Indus., Inc.,* 250 N.J.Super. 478, 595 A.2d 534, 550 (Ch.Div.1991).

██ The Trustee first argues that the first prong has not been satisfied as to most of the 45 check payments—that these payments did not benefit MOC. This threshold argument focuses on each payment in isolation, and without consideration of other equitable factors. The remainder of section II.B. discusses the court's findings on this benefit issue for each of the 45 checks.

David Cushworth testified for the Trustee on this issue. He was familiar with the operations of MOC, and he handled the accounting for MOC in 1988 and 1989, and for CDS commencing February 1, 1989.

John Keichline testified for CDS on the benefit issue. He had nothing to do with the financial management of CDS. Indeed, his understanding of the financial management was based upon representations of his father, *e.g.,* Transcript at 151, who did not testify in this proceeding. Few, if any, of the checks were written with John Keichline's knowledge. He had no reason to know all of the business expenses of CDS. He also had very little knowledge of the operations and financial management of MOC. For these reasons, to the extent the testimony of Cushworth and John Keichline conflicts, those conflicts will be resolved in favor of Cushworth.

Cushworth explained that certain of the 45 checks were expenses of CDS, or otherwise did not benefit MOC. For instance, check no. 503 for $1,026.77 payable to the attorney for "Getty" related to a truck accident in 1988 that occurred while the truck was being driven for a CDS delivery. CDS' claim for reimbursement of this check is disallowed.

Five other checks can be discussed together as they all were payments for insurance premiums on motor vehicles. Four of the insured vehicles were used by CDS, or were not used by MOC. Specifically, CDS used the 1978 silver General Motors truck and the 1985 white Ford van. Transcript at 130, 144–45. MOC did not use the 1988 Chevrolet Blazer, which was John Keichline's personal vehicle. *Id.* at 176. MOC did not use

---

assertions unless otherwise indicated in this opinion.

**2.** The remaining $1,000 of check number 543 is disallowed for the reasons discussed in both sections II.B. and II.C. of this Opinion.

the 1984 Lincoln Town Car, which was William Keichline's personal vehicle.

For four of these insurance checks, CDS claims full reimbursement. These claims are disallowed. Regarding the fifth check (number 171) for $500.00, CDS recognizes that it is not entitled to full recovery on this check, and it has reduced its claim on that check from $500.00 to $206.00. However, CDS has failed to explain the evidentiary basis for even this reduced $206.00 amount. Consequently, that particular $500.00 amount will also be disallowed.

Five other checks can be discussed together as they were for rental payments for office, warehouse and storage space at Glasgow Pines Business Center at 100 Scotland Ave., Bear, Delaware.[3] CDS claims these rental payments in full; however, it again did not satisfy its burden on the benefit issue. While the office at Glasgow Pines became the headquarters for MOC in the Fall of 1988, CDS also used the premises and was obligated to reimburse MOC to some extent for a portion of the rent. Transcript at 88–89, 100. Also, as to at least one of the payments, the evidence was insufficient to conclude that MOC benefited at all. *Id.* at 34 (discussing William Keichline's rental of storage space for personal use).

Eight other checks[4] cannot be conveniently categorized, but as to each, the record is sufficient to find that the payments did not benefit MOC, or did benefit CDS. In summary, the court finds that as to 19 checks totaling $16,671.93 listed in Appendix A, CDS did not satisfy its burden under *Allegheny* to show a quantifiable benefit to MOC.[5]

Eight other checks related to expenses for several cellular phones.[6] These checks total $5,287.69. It is not disputed that John Keichline used a mobile phone in his work for CDS, and CDS has appropriately claimed only a portion of this total in Appendix A.

As to these payments, the court adopts the proportions of benefit to MOC that CDS asserts for these seven checks—a total of $2,489.09.

Thus, of the $26,143.66 objected-to amount, only $8,791.73 satisfies the benefit prong of the *E.F. Drew* standard.[7] As the next section discusses, however, not even this reduced amount will be allowed.

### C. It Would be Inequitable to Allow the Objected-to Portion of CDS' Claim.

■ The Trustee objects on more general grounds to CDS' claim. He argues that the equitable principles applicable in evaluating CDS' claim for money had and received, the second prong of the *Drew* standard, should lead the court to conclude that recovery in favor of CDS would be inequitable.

■ There are several equitable principles relevant here. He who seeks equity must do equity. Equity will not grant affirmative relief to one with unclean hands, where the misconduct directly relates to the legal controversy. *Walter v. Walter*, 37 Del. Ch. 35, 136 A.2d 202 (1957). *See generally* 30A C.J.S. *Equity* §§ 95–101, 102–114 (1992). Equity will also disregard apparently distinct business entities where the persons controlling the entities disregard the distinction and use the entities for their own purposes. *Martin v. D.B. Martin Co.*, 10 Del.Ch. 211, 88 A. 612, 614–16 (1913). Application of these principles to the facts here lead the court to conclude that CDS should not recover upon the objected-to portion of its claim.

William Keichline was in control of MOC. He, along with his wife, was also in control of CDS, regardless of whether CDS was a partnership or a corporation, and regardless of who legally should have been in control. John Keichline testified that none of the

---

**3.** These five checks are numbers 302, 349, 395, 420, and 561.

**4.** These eight checks are numbers 470, 480, 495, 536, 570, 578, 579, and 589.

**5.** These 19 checks are numbers 141, 171, 256, 300, 302, 349, 395, 420, 470, 480, 495, 503, 529, 536, 561, 570, 578, 579, and 589.

**6.** These eight checks are numbers are 142, 176, 203, 295, 320, 362, 402, and 416 (Cellular One).

**7.** This $8,791.73 figure is the sum of check numbers 102, 103, 163, 191, 264, 285, 286, 291, 301, 384, 391, 409, 410, 416 (Zipworks), 417, 437, 440, 454, plus the claimed amounts for the eight checks listed in footnote 6.

checks signed "John Keichline" were actually signed by him. Transcript at 159. While John Keichline believed he was the general partner or president of CDS, he had to request checks and deposit slips from his father. Transcript at 140, 143. William and Marie Keichline possessed the checkbook. Through March 17, 1989, the checks were written by William or Marie Keichline, or at their direction. *E.g.,* Transcript at 103–104.

This control was used inappropriately, to muddy and disregard the legal, financial, and operational distinctions between the Keichlines, CDS, and MOC. For example, as to the legal and financial distinctions, CDS did not file a tax return for the 1988 calendar year. Transcript at 21. Other than the checkbook, the Keichlines did not maintain books and records for CDS. Transcript at 21. William Keichline represented to Cushworth that MOC should receive 25% of the gross profits of the delivery service income. *Id.* at 64–67, *see also id.* at 25.

Another example relates to the lease for a 1989 Ryder truck (claimant exhibit number 10). William Keichline signed the lease for CDS as "President." According to John Keichline's understanding of the legal structure of CDS, his father was not President, and did not have authority to enter into leases on behalf of CDS. *E.g.,* Transcript at 190–192.

The murky distinction between the operation of the ostensibly separate entities is apparent from the examples discussed in section II.B, including CDS' indiscriminate use of MOC assets. CDS used the 1985 Ford White Van and 1978 Silver General Motors truck. *Id.* at 130, 144–45. CDS used MOC employees and phones and warehouse space. *Id.* at 19–20, 88–89, 185–86, 194, 195.

The Ryder lease also illustrates the unclear operational distinction. While the lease listed both MOC and CDS as the lessor, only CDS had a need for the truck. To confuse matters further, the last page of the lease lists only CDS as the customer.

Particularly telling is that even by the end of 1988, Cushworth still believed that CDS and MOC were indistinguishable as an operational matter. *Id.* at 14, 23, 104–105. It was for this reason that he suggested to William Keichline that CDS should be incorporated. *Id.* at 14.

However, the inappropriate uses of the entities continued after the incorporation. William Keichline still used CDS funds for personal purposes, as exemplified by check number 561 (for rent on a storage unit that William Keichline decided to rent for himself), Transcript at 81, and check number 579 (for a personal liability of Bill Keichline, Jr., another of William's sons). Transcript at 83, 103.

Equity should not allow William and Marie Keichline to benefit from the inappropriate uses. They hold 51 of the 100 issued shares of CDS and would benefit from an allowed claim.

Moreover, they, insiders of CDS, are responsible for the absence of ledger books, and corporate records for CDS, and the consequent incomplete information concerning CDS' financial affairs during 1988 and 1989. The gaps and inconsistencies in the information concerning the financial interrelationship between CDS and MOC are directly at issue in this objection to claim proceeding. To allow William and Marie Keichline to benefit from this absence of evidence would be truly inequitable.

Claim number nine is allowed for only $5,904.70.[8]

IT IS SO ORDERED.

---

8. The Trustee also questions whether CDS, Inc. succeeds to the rights of the pre-incorporation entity CDS in recovering payments that allegedly benefitted MOC. In light of the rulings herein, it is not necessary to address this issue. It is also not necessary to reach the issue of whether the claim of CDS should be subordinated.